UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

DEBRA McCAULEY                          CIVIL ACTION NO. 6:18-cv-00719

VERSUS                                  MAGISTRATE JUDGE HANNA

U.S. COMMISSIONER, SOCIAL               BY CONSENT OF THE PARTIES
SECURITY ADMINISTRATION

## MEMORANDUM RULING

In accordance with the provisions of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to have this matter resolved by the undersigned Magistrate Judge, and it was referred to this Court for all proceedings, including entry of judgment. (Rec. Doc. 6). Before this Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, the Commissioner's decision is affirmed.

## Administrative Proceedings

The claimant, Debra McCauley, fully exhausted her administrative remedies before filing this action in federal court. She filed applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"), alleging disability beginning on January 17, 1997.[1] Her application for SSI was

---

[1]      Rec. Doc. 11-1 at 201, 203.

granted, but her application for DIB was denied.[2]  She requested a hearing, which was held on January 19, 2017 before Administrative Law Judge Rowena E. DeLoach.[3]  The ALJ issued a decision on March 1, 2017, concluding that the claimant was not disabled within the meaning of the Social Security Act from the alleged disability onset date through the date she was last insured for Social Security disability benefits.[4]  The claimant requested that the Appeals Council review the ALJ's decision, but the Appeals Council found no basis for review.[5]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review.[6]  The claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

The claimant was born on May 21, 1953.[7]  At the time of the ALJ's decision, she was two months shy of her sixty-fourth birthday.  She graduated from high

---

[2]      Rec. Doc. 11-1 at 122, 123.

[3]      A transcript of the hearing is found in the record at Rec. Doc. 11-1 at 81-112.

[4]      Rec. Doc. 11-1 at 62-76.

[5]      Rec. Doc. 11-1 at 6.

[6]      *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]      Rec. Doc. 11-1 at 114, 124, 201, 203.

school in 1971,[8] trained as a licensed practical nurse,[9] and worked as a nurse in the cardiac care department at Lafayette General Medical Center ("LGMC") in Lafayette, Louisiana.[10] She alleged that she has been disabled since January 17, 1997 due to a back injury, right leg and foot pain, depression, and Type 2 diabetes.[11] Following a workplace accident in May 1996, she was out of work for a period of time then returned to work as a data entry clerk in LGMC's cardiac care department for approximately six months.[12] She allegedly reinjured her back on January 17, 1997[13] and did not return to work thereafter.

The issue presented in this appeal is whether the claimant became disabled on or before June 30, 2002, the date on which she was last insured for Social Security disability benefits. Because this Court concludes that there was substantial evidence in the record supporting the Commissioner's decision that the claimant was not disabled before her date last insured, the medical records and treatment notes for the

---

[8]     Rec. Doc. 11-1 at 87, 235.

[9]     Rec. Doc. 11-1 at 87, 235.

[10]    Rec. Doc. 11-1 at 101, 235.

[11]    Rec. Doc. 11-1 at 114, 124.

[12]    Rec. Doc. 11-1 at 103-104.

[13]    Rec. Doc. 17-3 at 143, 299.

time period after the date last insured are not summarized in detail, below. However, those records were carefully reviewed by this Court.

On September 8, 1994,[14] the claimant was seen in the emergency room at LGMC complaining of lower back pain with burning pain to her right buttock and right thigh after feeling a pop in her back while at work. She followed up with Dr. Donald C. Harper on October 25, 1994.[15] He diagnosed her with sacroiliitis and prescribed physical therapy, Xanax, Lortab, and Dilaudid. When the claimant saw Dr. Harper again on December 5, 1994,[16] she complained of pain and poor endurance. She followed up with Dr. Harper on February 9, 1995, March 23, 1995, and October 10, 1995.[17]

The claimant saw Dr. Clifton W. Shepherd, Jr., an orthopaedic surgeon, on March 28, 1995 for complaints of lower back pain and right leg pain.[18] She told Dr. Shepherd she had been injured while working as an LPN at LGMC and moving a patient. She reported that she had been seen in the emergency room on the date of the accident and then treated with Dr. Harper. Her treatment had included bed rest,

---

[14]     Rec. Doc. 17-2 at 330.

[15]     Rec. Doc. 17-2 at 332.

[16]     Rec. Doc. 17-2 at 333.

[17]     Rec. Doc. 17-2 at 334, 335; Rec. Doc. 17-3 at 317.

[18]     Rec. Doc. 17-2 at 336-338.

medications, physical therapy, and a back brace, but no diagnostic testing. She also complained of neck pain and headaches. She was then taking Relafen, Premarin, Xanax, and Lortab. She had returned to work on a light duty basis. X-rays of her lumbar spine were normal. Dr. Shepherd noted that the claimant displayed "a very benign, objectively normal examination." He disagreed with her being prescribed tranquilizers and narcotics. He recommended an MRI and CT scan.

A lumbar MRI of April 5, 1995 showed a right posterolateral disc protrusion at L5-S1 and a mild paracentral disc protrusion at L4-5.[19] A CT scan of the lumbar spine of the same date showed mild right posterolateral disc protrusion and neural foraminal narrowing at L5-S1 and mild paracentral disc protrusion at L4-5.[20] After reviewing the diagnostic test results, Dr. Shepherd opined[21] that the claimant could return to "a light duty situation" without heavy lifting and recommended that she take only anti-inflammatory medicine. He strongly disagreed with her taking narcotic medications.

On September 27, 1995, case management consultant Noleen Fruitticher described a meeting with the claimant regarding her ability to return to work while

---

[19]     Rec. Doc. 11-2 at 133.

[20]     Rec. Doc. 11-2 at 134.

[21]     Rec. Doc. 17-2 at 341-342.

taking all of the medications she was then taking, including Relafen, Dilaudid, Lortab, Xanax, and Amiltriptylene.

On March 11, 1996, the claimant saw Dr. Wayne T. Lindemann of Professional Rehab Services of Acadiana.[22] The claimant was working light duty at LGMC, working on a computer compiling statistics for one of the units and was able to take a break every two hours. She gave a history of having hurt her back while transferring a patient and having had unsuccessful physical therapy. She had discontinued taking Dilaudid but was continuing Relafen and was taking about twelve Lortab a month. She reported occasional pain radiating down her right leg but denied numbness or weakness. She reported sleeping on a heating pad and applying Tiger Balm to her back each day. Dr. Lindemann diagnosed chronic right multifidus triangle strain with a myofascial component. He recommended that she continue on light to medium level duty at work, stretching at her desk every fifteen to twenty minutes. He refilled her Relafen, prescribed Ketoprofen cream, and recommended a foot stool for her right foot.

When the claimant returned to Dr. Lindemann on June 3, 1996, she reported having reinjured her back at work at LGMC when an elevator stopped abruptly, causing her to fall to her knees. X-rays showed no acute abnormalities but noted

---

[22]     Rec. Doc. 17-3 at 314.

lumbar spondylosis. The claimant's primary complaint was low back pain with some radiation down the left leg and occasional numbness of a portion of the left foot. Dr. Lindemann continued the Relafen, advised taking Lortab at night, and planned lumbar steroid epidural injections ("LESIs").

On September 10, 1996,[23] Dr. Lindemann noted that the claimant had good results from an LESI in June 1996 and was taking Relafen and Lortab. Dr. Lindemann encouraged her to stop the Lortab. Another LESI was scheduled.

Ms. McCauley saw Dr. Lindeman again on September 19, 1996.[24] He continued her medications and prescribed physical therapy and a strengthening and flexibility program.

When the claimant saw Dr. Lindemann again, about a month later, on October 10, 1996,[25] he noted that she had had two LESIs that provided some relief. Her physical therapy was going well, but she complained of trouble sleeping. He prescribed Desyrel to help her sleep, continued the Relafen and Lortab, and prescribed Ketoprofen cream to apply to her back three times per day. Dr. Lindemann also ordered an MRI of her lumbar spine. The MRI, obtained on October

---

[23]     Rec. Doc. 17-3 at 24-25.

[24]     Rec. Doc. 17-3 at 23.

[25]     Rec. Doc. 17-3 at 26.

15, 1996, showed lumbar and lower thoracic spine spondylosis.[26]  On October 31, 1996, Dr. Lindemann noted that the MRI showed some bulging of the disc at L4-5 and L5-S1 but no nerve root displacement.  Ms. McCauley reported that the Ketoprofen cream was helping, she was going to physical therapy, she was doing spinal stabilization exercises at home, and she was continuing to do data entry work at LGMC.  Dr. Lindemann noted that "[o]verall she is doing well."

Ms. McCauley returned to see Dr. Lindemann on December 5, 1996,[27] reporting a motor vehicle collision on November 22, 1996 and complaining of neck and low back pain.  She was taking Lortab and Soma three to four times per day and had missed four to five days of work.  He replaced her Relafen with a Medrol Dosepak and added Zantac to protect her stomach.  She was to continue physical therapy with ice and deep heat, she was to continue using a TENS unit, and he was referring her to Dr. Steven Staires of LGMC's Chronic Pain Medicine Program.[28]

The claimant saw Dr. Lindemann again on January 2, 1997 with both cervical and lumbar pain.[29]  He ordered an MRI of her lumbar spine and renewed her medications except for Soma.  He recommended weaning her off Lortab as well.  On

---

[26]    Rec. Doc. 11-2 at 136.

[27]    Rec. Doc. 17-3 at 318-319.

[28]    The only treatment notes in the record from Dr. Staires are from 2003 and largely illegible.

[29]    Rec. Doc. 17-3 at 32-33.

January 14, 1997, he gave her trigger point injections in the mid region of her upper trapezius muscles bilaterally.[30]

A CT scan of the lumbar spine on February 19, 1997 showed a broad-based disc bulge at L5-S1 with mild compromise of the neural foramina, slightly greater on the right than the left and mild facet sclerosis bilaterally at L5-S1.[31]

In his report dated May 26, 1999,[32] psychiatrist Dr. James J. Blackburn stated that he initially saw Ms. McCauley on November 3, 1998 after referral from Dr. Staires[33] due to the claimant's "histrionic personality traits, particularly as they relate to somatization and magnification of her pain symptoms." Dr. Blackburn stated that Ms. McCauley had significant depression and severe emotional turmoil. He explained that he prescribed Oxycontin, Serazone, and Celexa, which, together with cognitive therapy, had resulted in the claimant becoming "less emotionally symptomatic." Dr. Blackburn stated that he had not observed her exaggerating her pain complaints. He recommended continued psychiatric outpatient therapy with appropriate medications. It was his opinion that this would help her to better manage

---

[30]     Rec. Doc. 17-3 at 38.

[31]     Rec. Doc. 17-3 at 361.

[32]     Rec. Doc. 17-3 at 147-149.

[33]     This, however, is the earliest of Dr. Blackburn's treatment notes in the record and the only treatment notes from Dr. Staires are from 2003.

her chronic pain. In July 1999,[34] Dr. Blackburn noted that the claimant's depression had worsened. In August 1999,[35] he noted that her mood had improved with an increase in Celexa dosage. He recommended that she see Dr. Olga Reavill (who does not use excessive amounts of narcotic medication or perform invasive procedures) for possible pain management and that she have individual counseling with a psychiatric social worker. Ms. McCauley began seeing psychiatric social worker Simone J. Blackburn on September 22, 1999.[36] On October 6, 1999,[37] Ms. Blackburn noted that the claimant felt bad physically, was depressed and sad, and had trouble sleeping at night but her husband was very supportive.

On October 12, 1999,[38] Dr. Blackburn noted that Ms. McCauley's condition was deteriorating secondary to increased pain. He stated that she could not walk far because her right leg would shake, become weak, and almost give way. She had stopped hydrotherapy because she was having to pay for it herself. Dr. Blackburn was concerned about continuing to prescribe Oxycontin and recommended that the claimant see a pain management specialist, particularly Dr. Reavill.

---

[34] Rec. Doc. 17-3 at 59.

[35] Rec. Doc. 17-3 at 176-177.

[36] Rec. Doc. 17-2 at 58.

[37] Rec. Doc. 17-3 at 57.

[38] Rec. Doc. 17-3 at 55-56.

On October 20, 1999, Ms. Blackburn noted that the claimant was anxious and having suicidal thoughts. On November 19, 1999, the claimant reported to Ms. Blackburn that a short visit to her sister "caused her much distress and pain" but reported that her medication helps her to function as best she can. On November 30, 1999, Dr. Blackburn opined that the claimant's condition would not improve unless she was allowed to see a chronic pain management specialist and have physical therapy. He increased the dosage of her Oxycontin. On December 14, 1999,[39] Ms. Blackburn noted that the claimant reported bad panic attacks. She was taking Serazone, Celexa, and Ativan. On January 21, 2000,[40] Dr. Blackburn again increased the dosage of Oxycontin and again recommended that she be allowed to see a pain management specialist, have appropriate physical therapy, and obtain updated diagnostic studies. He noted that she was having fewer panic attacks but had a significant increase in her level of depression due to the fact that she cannot function as a nurse or as a whole person.

On February 29, 2000,[41] Dr. Blackburn noted that the claimant continued to have severe pain that increased with more physical activity. He described her as

---

[39]     Rec. Doc. 17-3 at 51.

[40]     Rec. Doc. 17-3 at 173.

[41]     Rec. Doc. 17-3 at 172.

discouraged, frustrated, and angered.  He recommended psychiatric therapy for her and her husband.  He also recommended pain management treatment.

On April 4, 2000, the claimant was examined by clinical psychologist F.T. Friedberg.[42]  The purpose of the examination was to "assess psychological state relating to her injury at work, and her ability to return to viable vocational endeavors."  He administered several tests.  He found that she functioned in the normal range of intelligence, emotional factors did not interfere significantly with her cognitive functioning, her word recognition was at a post high school level but her arithmetic reasoning was only at a seventh grade level.  No cognitive deficits were noted.  She had no indications of any visual perceptual difficulties.  She had good concentration and attention to visual material.  The Beck Depression Inventory reflected only minimal depressive symptomatology with some general anhedonia, self criticism, and being annoyed or irritated more easily than she had been.  She admitted to fatigue, sleep disturbance, and having to take extra effort to get started doing things.  She exhibited a preoccupation with somatic difficulties but no excessive anxiety or depression.  Despite her long history of chronic pain, Dr. Friedberg found that she appeared able to handle a vocational endeavor that would not compromise her medical situation or exacerbate her pain.

---

[42]     Rec. Doc. 11-2 at 147-149.

That same day, Ms. Blackburn counseled the claimant and her husband.[43] On May 3, 2000, the claimant reported to Ms. Blackburn that she had been having migraine headaches most of her life and was having one that day.

When the claimant met with Dr. Blackburn on June 14, 2000, she was "tearful, distressed, depressed[,] and totally distraught." He encouraged her to be hopeful and she signed a no suicide contract. He increased the dosage of her anti-depressant medication. When the claimant returned to Dr. Blackburn on July 27, 2000,[44] he noted that she was continuing to experience significant pain and was hoping to be allowed to see an orthopedist for further evaluation of her back condition. She had returned to aquatherapy, which was strengthening her muscles and improving her mood. Her depression and mood had improved with her medication.

Ms. McCauley saw Dr. Angela Mayeux, an orthopedist, on August 17, 2000.[45] She reported that a second injury on January 17, 1997 when she felt a catch in her back while working on a paper jam in a copying machine. On physical examination, the claimant was exquisitely tender from L2 to the sacrum and tender at the right SI joint, right gluteal notch, right trochanteric bursa, and right iliotibial ("IT") band. Her range of motion was limited to forward flexion with her fingertips to the superior

---

[43]     Rec. Doc. 17-3 at 49.

[44]     Rec. Doc. 17-3 at 84-85.

[45]     Rec. Doc. 17-3 at 143; 299-301; Rec. Doc. 11-2 at 150, 151, 199

poles of the patella. Extension was 75% of normal. She had to be encouraged to rise on her toes and rock back on her heels. Motor was 5/5 in all groups, sensory was intact, deep tendon reflexes were 1+ and symmetrical at the knees, ½+ and symmetrical at the ankles. She had no evidence of nerve root tension but a strongly positive Fabere's test on the right (suggesting pathology of the SI joint). Dr. Mayeux reviewed x-rays, CT scans, and a bone scan. She found that the claimant had marked symptom magnification with positive Waddell signs (indicative of malingering in patients with back pain) with skin tenderness and pain with rotation of the trunk. Due to the physical findings, Dr. Mayeux found that the claimant's use of pain medication was "grossly out of proportion." She opined that the claimant was capable of returning to her previous employment. Her diagnoses were sacroiliitis, piriformis syndrome, and IT band syndrome.

On August 30, 2000,[46] Ms. McCauley reported to Dr. Blackburn that she had a negative experience with Dr. Mayeux. She told him that Dr. Mayeux said she was taking too much pain medication and that her condition could be treated with injections and physical therapy.

In his report of October 5, 2000, Dr. Blackburn noted that he had reviewed Dr. Mayeux's report of her examination of the claimant as well as the rulings issued

---

[46]     Rec. Doc. 17-3 at 86.

in Ms. McCauley's workers' compensation case. He stated that Ms. McCauley thought the judge was fair, and Dr. Blackburn said he would be delighted to turn over management of the claimant's physical pain to a pain management specialist, again recommending Dr. Reavill. He noted that Ms. McCauley was working with a vocational rehabilitation specialist to arrange for job applications but he opined that she "is not anywhere close to being ready to return to work."

On November 7, 2000,[47] Dr. Blackburn reported that the claimant was still waiting for an appointment with Dr. Reavill and had not returned to aquatherapy because there was a dispute over the cost of that therapy. Her pain control was "only fair." She was emotionally upset because her mother had been diagnosed with cancer and because her doctor had recommended that she stop taking estrogen.

On December 6, 2000, Dr. Blackburn reported that the claimant had still not seen Dr. Reavill although an appointment was scheduled. He noted that the claimant continued to complain of pain and multiple stressors. He continued her Oxycontin "out of necessity." He opined that the claimant's psychiatric condition should improve with decreased pain.

When the claimant met with Dr. Reavill on December 12, 2000,[48] she complained of right-sided hip pain that was a constant, pulling type pain that

---

[47]     Rec. Doc. 17-3 at 88.

[48]     Rec. Doc. 17-3 at 66-70.

improved with traction and worsened with standing, sitting, stooping, and climbing stairs. She reported that her pain improved with pool therapy and message. She stated that she was taking Oxycontin 20 mg. every eight hours to keep her pain level at three out of ten. Straight leg raise tests were negative as were tests of her sensory and motor systems. Dr. Reavill diagnosed sacroiliitis and lumbar degenerative disc disease. She noted that the claimant would have to be detoxed from opioid pain medication prior to pain management and that, after being detoxed, a possible sacroiliac joint block or sacroiliac joint cryotherapy would be attempted as well as a possible pain pump.

On January 5, 2001,[49] Dr. Blackburn reported that the claimant was "significantly upset" after her appointment with Dr. Reavill and that Dr. Reavill required that the claimant detox from narcotic medication before treatment. Dr. Blackburn created a detox schedule with the claimant.

When the claimant returned to Dr. Blackburn on January 25, 2001,[50] she was experiencing significant pain and emotional distress as well as a significant elevation in her blood pressure. Dr. Reavill had told her that she would have to get her cardiac condition and blood pressure stabilized before they could continue treatment. The

---

[49]     Rec. Doc. 17-3 at 90.

[50]     Rec. Doc. 17-3 at 431.

16

claimant's level of distress was greater as she was detoxing and she required reassurance that she would be able to do something positive with her life.

On February 13, 2001,[51] Dr. Blackburn reported that the claimant had tapered her Oxycontin from a dosage of 90 mg. per day to 40 mg. per day but was experiencing increased pain. He noted that, although Ms. McCauley seemed more depressed, she was determined to complete the program to be free of analgesic medication and allow further treatment with Dr. Reavill.

When the claimant saw Dr. Reavill on March 12, 2001,[52] she was completely weaned off her medication, was hurting more, and had had an episode of supraventricular tachycardia ("SVT"), an abnormally fast heartbeat. Dr. Reavill diagnosed sacroiliac ("SI") joint illiitis with radiculopathy and scheduled SI joint blocks.

Ms. McCauley saw Dr. Blackburn the next day, March 13, 2001.[53] Remeron had been added to her medication regimen as she weaned off the analgesics. She reported being in more pain and engaging in less activity. She also reported having had a positive encounter with Dr. Reavill.

---

[51]     Rec. Doc. 17-3 at 95.

[52]     Rec. Doc. 17-3 at 71.

[53]     Rec. Doc. 17-3 at 285.

Dr. Reavill performed left and right S1, S2, S3 nerve cryoneurolysis injections on March 23, 2001.[54]

On April 2, 2001,[55] the claimant reported to Dr. Blackburn that the injections had been very painful but she was very pleased that she could sit down and stand up without the catch in her back she had previously experienced. She still reported significant pain radiating down her right leg and into her back. She was not sleeping well and was fearful that her pain might not be relieved. Dr. Blackburn added Seroquel to her medications.

On April 9, 2001,[56] the claimant reported to Dr. Blackburn that she was sleeping better with the Seroquel. She felt positive about her visits with Dr. Reavill. Although still concerned about future disability, she was willing to cooperate.

The claimant again saw Dr. Reavill that same day.[57] She complained about pain on the right side of her buttock going down the leg and then crossing over right above the knee to the front of her leg. There was no pain in her SI joints, she had an increased range of motion, her reflexes were intact, the facets at L1-L5 were very

---

[54]     Rec. Doc. 11-2 at 152.

[55]     Rec. Doc. 17-3 at 100-101.

[56]     Rec. Doc. 17-3 at 102.

[57]     Rec. Doc. 17-3 at 75.

painful, and she had a decreased range of motion and positive trigger points in her back. Dr. Reavill planned to follow up with lumbar facet blocks.

On April 17, 2001, the claimant saw Dr. Blackburn. He noted that she had increased her Seroquel dosage for consistent sleep improvement. She was waking up during the night, sometimes due to pain and sometimes due to emotional turmoil. Some of the pain relief she had experienced was diminishing. She was more depressed and obsessed with feeling that she is totally useless. He increased her Remeron dosage.

On April 26, 2001, Dr. Blackburn prepared a psychiatric report to Janet R. Istre, the case manager assigned to Ms. McCauley's workers' compensation claim.[58] He stated that the claimant was continuing to experience significant pain. He also stated that her blood pressure had been normal before January 2001 but had increased as her pain level increased as she was taken off Oxycontin. He explained that he was continuing to prescribe Soma because it was a "minimal amount of medication" to decrease physical discomfort, muscle spasms, and overall distress. He also stated that Ms. McCauley began to experience episodes of severe tachycardia after getting off the Oxycontin. He further stated that Soma did not contribute to the claimant's depression, insomnia, or irritability and opined that the

---

[58] Rec. Doc. 11-2 at 153-157.

"prolonged period of time during which she has had to deal with her pain without access to appropriate pain management has contributed more to all of the above symptoms than any conceivable combination of Soma." He stated the claimant was likely psychologically dependent on her medication but not addicted. Dr. Blackburn opined that the claimant's pain aggravates her emotional distress and she is "too depressed, distressed[,] and experiencing too much turmoil to function in any gainful employment situation."

On April 30, 2001,[59] case manager Jane R. Istre prepared a letter to Dr. Reavill, confirming her understanding of a rehabilitation conference held that day. She confirmed that Dr. Reavill's diagnosis was lumbar facet syndrome, that Dr. Reavill recommended lumbar facet blocks, and if those were unsuccessful would recommend lumbar facet radiofrequency. She confirmed that Dr. Reavill found that Ms. McCauley had increased range of motion, intact reflexes, and relief of SI joint pain following the cryotherapy. She confirmed that Dr. Reavill prescribed Relafen for the claimant, might occasionally prescribe Darvocet or Vicoden for pain control but never prescribed Soma or Ativan because they are too addictive. She confirmed that Dr. Reavill was of the opinion that the claimant was capable of secretarial work although she might require position changes as needed.

---

[59]     Rec. Doc. 17-3 at 76-78.

On May 7, 2001,[60] Dr. Blackburn noted that the claimant was depressed, distraught, tearful, and confused. Her blood pressure was continuing to rise despite efforts to control it. His opinion was that her increased blood pressure was secondary to her pain level. Because of the high blood pressure, she had increased fear and anxiety about having a stroke. Dr. Blackburn stated that it took two hours for him to calm her down and stabilize her mood.

On May 30, 2001, Dr. Blackburn noted that the claimant was still experiencing depression and pain but her blood pressure was better. She remained distressed about what she perceived as a bleak future. In his opinion, her blood pressure was elevated because of her pain. He noted that Dr. Reavill would not treat her until her blood pressure was stabilized. He described the claimant as being in "a very fragile emotional and physical state."

On June 26, 2001,[61] Dr. Reavill confirmed to case manager Istre that she had not spoken with Dr. Blackburn, that she did not share Dr. Blackburn's opinion that the claimant's high blood pressure was elevated due to her pain, that she did not believe the claimant was in a treatment dilemma, that she did not believe the claimant had significant physical limitations, that she was willing to reevaluate the claimant's

---

[60]     Rec. Doc. 17-3 at 111-112.

[61]     Rec. Doc 17-3 at 79-81.

condition, and that she then would them be willing to confer with the claimant, Dr. Blackburn, and the case manager.

On June 28, 2001,[62] Dr. Blackburn reported that the claimant continued to have significant pain, overall discomfort, very obvious depression, and elevated blood pressure. He reiterated his opinion that her high blood pressure was caused by her pain level. He was concerned about whether she would be able to be treated by Dr. Reavill in the near future.

The claimant saw Dr. Reavill on July 16, 2001.[63] She was continuing to have left hip pain radiating down to her leg, which she rated at eight out of ten. Her blood pressure was elevated, and she was having bouts of SVT. Dr. Reavill noted that the claimant "subjectively cannot bend forward." She diagnosed intractable low back pain and sacroiliitis. She stated that she did not prescribe pain medication but, as an interventionalist pain management physician, performed procedures to eliminate pain. She further stated that she could not perform any procedures on the claimant until her blood pressure and SVT were under control.

On July 25, 2001, the claimant was seen in the emergency room at Medical Center of Southwest Louisiana for low back and lower extremity pain. Dr. Scott Gammel was consulted. His impression was acute lumbar radiculopathy, not well

---

[62]      Rec. Doc. 17-3 at 115.

[63]      Rec. Doc. 17-3 at 82-83.

controlled. He noted the claimant's history of hypertension and depression. Dr. Gammel admitted the claimant to the hospital for pain control using a PCA (patient-controlled analgesia) with Demerol. He planned to obtain an MRI to rule out acute pathology. He continued her medications for hypertension. He prescribed Baclofen and Valium for muscle spasms. She was discharged on July 27 with instructions to follow up with Dr. Gammel on August 2. Her discharge medications were Baclofen, Relafen, Oxy1R, Oxycontin, and Valium.

The MRI obtained on July 26, 2001[64] showed a broad posterior annular bulge to the right at L5-S1 with accompanying facet degeneration, bilateral lateral recess, and proximal foraminal stenosis as well as a potential free disc fragment abutting the S1 nerve root.

When the claimant followed up with Dr. Gammel on August 2, 2001,[65] she reported that her symptoms were much improved although she continued to have persistent radicular symptoms. She was taking Oxycontin 20 mg three times a day and OxyIR three to five times per day. She was also taking Baclofen and Valium for muscle spasms as needed. Her ankle reflexes were absent bilaterally. She had a significantly positive seated straight leg testing on the right and an equivocal test on the left. She had tenderness to palpation over the SI joints bilaterally and increased

---

[64]    Rec. Doc. 17-2 at 304-306.

[65]    Rec. Doc. 17-3 at 235-236.

paraspinous muscular tone in the lumbar spine. His impression was lumbar radiculopathy secondary to spinal stenosis and disc disease. His plan was to have the claimant follow up with Dr. Mayeux to see if surgery was warranted or if LESIs should be tried. He also recommended a spinal cord stimulator.

On October 25, 2001, Dr. Mayeux scheduled a myelogram to rule out a free disc fragment in the spinal canal.

The claimant followed up with Dr. Gammel on October 25, 2001.[66] She reported very good control of her symptoms with her current medications. Although she had some nausea, she was "doing relatively well" with the medical management and aquatic therapy. She had diffuse mild low back tenderness and a positive seated straight leg test. Dr. Gammel noted that Dr. Mayeux had seen the clamant but was deferring any opinion until obtaining additional information from the radiologist regarding the MRI. Dr. Gammel planned to refer the claimant to Dr. Muldowny for another surgical opinion.

On November 1, 2001,[67] Dr. Blackburn reported that the claimant had had a very positive experience at the Medical Center of Southwest Louisiana and with Dr. Gammel who had begun to manage her chronic pain with a resumption of Oxycontin. Dr. Blackburn also reported that the claimant had a significant increase in emotional

---

[66]    Rec. Doc. 11-2 at 53.

[67]    Rec. Doc. 17-3 at 250-252.

turmoil, depression, and general distress because her myelogram was scheduled at LGMC. She indicated that she did not feel safe going there. He indicated that whether her fears were fact-based or not, it was "unreasonable for her to be exposed to additional psychological trauma by being forced to go to [LGMC]."

The lumbrosacral myelogram and post-myelogram CT scan were conducted by Dr. Mayeux on December 20, 2001 at Medical Center of Southwest Louisiana.[68] The tests revealed a mild annular bulge with flattening of the anterior thecal sac at L4-5 with no central or foraminal stenosis. There was a diffuse annular bulge at L5-S1 that appeared contiguous to the right S1 nerve root, with minimal filling of what was suspected to be an edematous right S1 nerve root sheath, possibly due to compression by the bulging disc. No separate extruded disc fragment was detected.

On January 2, 2002,[69] Dr. Mayeux wrote to the case manager, explaining that the myelogram did not show a free disc fragment but did show a swollen S1 nerve root. In Dr. Mayeux's opinion, the claimant did not need surgical intervention but would benefit from an LESI.

The claimant saw Dr. Gammel again on January 16, 2002.[70] She appeared in mild to moderate distress, her blood pressure was 160/100, and her pulse was 92.

---

[68]     Rec. Doc. 17-3 at 144-145.

[69]     Rec. Doc. 17-3 at 205.

[70]     Rec. Doc. 11-2 at 51-52.

She had tenderness diffusely in the low back, 1+ patellar reflexes, absent ankle reflexes, and an equivocal seated straight leg raising test on the right. He refilled her medications and referred her to spine surgeon Dr. Munshi.

On January 28, 2002, Dr. Mayeux confirmed to the case manager that the claimant was not a surgical candidate, that she was not symptomatic with regard to the S1 nerve root findings of the recent myelogram, that the S1 nerve root problem was likely a chronic problem from degenerative changes, and that she had no right leg atrophy since her right leg was actually larger than her left leg. Dr. Mayeux further confirmed that an LESI might alleviate swelling of the S1 nerve root but might not relieve the claimant's pain because her symptoms were not related to the S1 nerve root. Dr. Mayeux confirmed that the claimant's hypertension would not preclude the LESI. Further, Dr. Mayeux confirmed that her opinion was that the claimant was capable of sedentary to light duty work with frequent changes in body position and that she had an approximate ten percent whole body impairment rating.

On February 7, 2002,[71] a rehab conference was held with Dr. Gammel, the claimant's case manager, and her attorney. That same day,[72] Dr. Gammel confirmed his opinion that Ms. McCauley was a candidate for an LESI based on the recent myelogram showing a swollen nerve root at S1. He confirmed his referral of the

---

[71]     Rec. Doc. 11-2 at 49.

[72]     Rec. Doc. 17-3 at 229-231.

claimant to Dr. Munshi, who is a neurosurgeon, to see if she was a surgical candidate although he admitted that Dr. Munshi was likely to agree with Dr. Mayeux. He also confirmed his recommendation that the claimant might benefit from a spinal cord stimulator. Further, he confirmed his opinion that the claimant was capable of performing sedentary to light duty work, however, he agreed that her return to work should be evaluated after the LESIs. He confirmed his opinion that the claimant would not reach maximum medical improvement until she had attempted a course of LESIs and been evaluated for a spinal cord stimulator.

The claimant returned to Dr. Blackburn on February 18, 2002.[73] She was in great distress, crying, and in a wheelchair due to an ankle injury sustained in a recent fall. He advised her to seek an orthopedic consult for her ankle. X-rays taken on February 19, 2002 showed an avulsed fracture near the cuboid bone of Ms. McCauley's right foot as well as a second avulsed fracture adjacent to the base of the little toe on the right foot.[74]

Dr. Gammel administered an LESI on February 20, 2002.[75]

---

[73]     Rec. Doc. 17-3 at 249.

[74]     Rec. Doc. 11-2 at 172; Rec. Doc. 17-2 at 228.

[75]     Rec. Doc. 17-3 at 223.

A week later, on February 28, 2001, the claimant saw Dr. David S. Muldowny, an orthopaedic surgeon.[76] Dr. Muldowny stated that it was difficult to determine if the claimant's back pain was related to the S1 dermatome because of her broken foot. He also discussed with her the fact that she was on such a heavy dose of narcotics that results from surgery would be unpredictable. He suggested waiting until her foot healed to further evaluate her problems.

Ms. McCauley returned to Dr. Blackburn on March 19, 2002.[77] She had a walking cast for her right foot and had seen Dr. Muldowny. She reported that the LESI "had limited effectiveness" but she was unable to evaluate its effectiveness due to the broken foot, which was painful and altered her gait. Dr. Blackburn noted that Dr. Gammel had increased her Oxycontin dosage. He noted that he had added Wellbutrin, which was helping with her depression although she "continued to have significant depression and overall distress." He increased the Wellbutrin dosage.

She returned to Dr. Muldowny on March 21, 2002.[78] Deep tendon reflexes were diffusely decreased bilaterally but were symmetric. A straight leg raise test was mildly positive on the right but negative on the left. Sensation was grossly intact. In Dr. Muldowny's opinion, the claimant likely did have a lumbar radiculitis

---

[76]     Rec. Doc. 11-2 at 76-77.

[77]     Rec. Doc. 17-3 at 248.

[78]     Rec. Doc. 11-2 at 78-79.

at S1 from whatever was causing the nerve root abnormality. He thought that she "could conceivably benefit from a decompression." He advised, however, that due to the duration of her symptoms, surgery might not relieve her symptoms. She indicated that she wanted to proceed. Therefore, he recommended a microdiscectomy at L5-S1 on the right.

Ms. McCauley returned to Dr. Gammel on April 16, 2002. She rated her low back pain and right leg pain at seven to eight on a ten-point scale despite using Oxycontin, OxyIR, Baclofen, Wellbutrin, Valium, Relafen, Remeron, Ativan, and TPI gel. She was tearful and in obvious distress. He continued her medications but added Toradol and gave her a shot of Toradol in the office.

On May 10, 2002,[79] Dr. Blackburn noted that Ms. McCauley was still very depressed, crying, and distressed because her workers' compensation carrier was requiring an independent medical examination before scheduling her surgery with Dr. Muldowny. Dr. Blackburn opined that the surgery should have been performed years earlier. He noted that the claimant reported problems with sleep, and he discontinued Sonata and prescribed Seroquel.

The claimant had an independent medical examination with Dr. W. Stan Foster on June 5, 2002.[80] Her primary complaints were constant burning pain in her

---

[79]     Rec. Doc. 17-3 at 247.

[80]     Rec. Doc. 17-3 at 352-354, 355.

lower back and nerve pain in the right buttock and down the right leg. She said that sometimes her right leg would go numb and she had pain when she coughed or sneezed. Her medical history included heart disease with SVT, hypertension, arthritis, and depression. Dr. Foster noted that the claimant extended both of her legs to full extension while sitting on the table for her husband to remove her socks. Any extension or lateral bending caused pain. When asked to flex forward, she flexed only 10 degrees and complained of severe pain. She had tenderness to palpation from L2 all the way down to S1 on the right side with no obvious muscle spasm and exquisite right sciatic notch tenderness. When asked to stand on her heels and toes, she did so, but Dr. Foster felt she was not putting out a complete effort. Knee jerks and ankle jerks were +1 and symmetrical but she complained of severe pain when he tapped her right ankle. A sitting straight leg raise test was negative on the left and positive on the right, which was inconsistent with the fact that she had extended her legs while sitting up to have her husband remove her socks. Pulses were +2 and symmetrical. Fabere's test was negative on the left but positive on the right. Sensation was decreased over the inner right thigh, right outer calf, right outer foot, and the right first web space as compared to the left. Dr. Foster noted that when he reviewed the x-rays, the claimant was sitting comfortably, turning to the right to face him with her right leg Indian style, with her right hip flexed more than ninety degrees with external rotation, which was inconsistent with the positive Fabere's

test.  He observed her left leg dangling off the table, she was leaning against the wall, and she appeared to be in no pain.  It appeared that when her husband noticed Dr. Foster observing this, the claimant immediately changed her position.  Dr. Foster watched her walk to her car with a normal gait and no signs of pain.  He opined that she needed to be weaned off her pain medication.  Dr. Foster's impression was that the claimant had a mildly traumatic type of accident but had psycho-social problems and significant signs of symptom magnification.  He would not recommend surgery because she would be unlikely to have a good result given the amount of pain medication she seemed to require and because she was extremely overweight.

The claimant saw Dr. Gammel again on August 7, 2002.[81]  Her symptoms were unchanged, and he refilled her medications.

She saw Dr. Muldowny on November 12, 2002 for preoperative counseling.[82] He saw her again on November 25, 2002, indicating that she was scheduled for surgery on December 10, 2002.[83]  However, there is no operative report in the record.

---

[81]     Rec. Doc. 11-2 at 41.

[82]     Rec. Doc. 11-2 at 82.

[83]     Rec. Doc. 11-2 at 85.

Ms. McCauley returned to Dr. Muldowny on January 30, 2003.[84] She reported that her leg still hurt but there was some positive improvement. She was to continue increasing her activities, as tolerated, and to return in six weeks.

On February 10, 2003, Dr. Gammel had a rehab conference with the case worker.[85] The claimant was approximately two months post-surgery but had not been in to see Dr. Gammel. They discussed weaning her off the pain medications.

The claimant returned to Dr. Muldowny on March 13, 2003.[86] She was about three months post-surgery and indicated that there had not been a lot of improvement. Her leg pain was somewhat better but still bothersome. She was disappointed in not getting the relief she had expected. Straight leg raise tests were negative. Dr. Muldowny indicated that he hoped things would improve with time. She was to return in six weeks.

When the claimant returned to Dr. Gammel on April 9, 2003,[87] she rated her pain at ten out of ten. She had run out of her opioid medications and reported low back pain, right lower extremity pain radiating into the foot, and numbness in the right outer aspect of her leg and into her foot. Dr. Gammel noted that the claimant

---

[84]     Rec. Doc. 11-2 at 87.

[85]     Rec. Doc. 11-2 at 39.

[86]     Rec. Doc. 11-2 at 88.

[87]     Rec. Doc. 11-2 at 35-37.

was quite distressed.  She had absent ankle reflexes bilaterally, a positive seated straight leg raising test on the right, increased tone and tenderness to the lumbar paraspinous region bilaterally, and a well healed midline lumbar scar.  He also noted skin changes consistent with the application of a heating pad.  His impressions were ongoing lumbar radiculopathy status post decompressive laminectomy, poor pain control without opioid management, and depression, anxiety, and increased situational stress.  Dr. Gammel restarted her opioid medications and prescribed a course of pool therapy.

The claimant saw Dr. Muldowny on May 1, 2003.[88]  He noted that she was doing about the same and stated "I am not sure if there is much more that I can offer."

The record contains no treatment notes from Dr. Blackburn between May 2002 and June 2012.

In a function report dated May 5, 2015,[89] the claimant stated that she could not walk, sit, or stand longer than twenty minutes without severe back pain and right leg and foot pain.  She also stated that she could not lift anything heavier than ten pounds.  She stated that she spent most of her day reading, doing needlepoint, or watching TV in bed.  She stated that chronic pain, back spasms, anxiety, and depression interfere with her sleep.  She stated that she can no longer work, bicycle,

---

[88]     Rec. Doc. 11-2 at 89.

[89]     Rec. Doc. 11-1 at 245-252.

camp, canoe, cook, or entertain guests. She stated that she uses a shower chair and needs assistance getting in and out of the bathtub. While she stated that she can dress herself, her husband brings her clothes to her. She stated that she does no cooking, household chores, or yard work due to severe pain and no longer drives. She explained that her right leg does not respond all the time, making her feel unsafe if driving. She stated that she walks with a cane and uses a wheelchair if she has to travel a long distance. She denied taking any prescription medications for her allegedly disabling conditions.

On January 19, 2017, the claimant testified at a hearing regarding her symptoms and her medical treatment. She testified that she had low back pain following the elevator accident that resulted in her spending more than half of each day in bed between 1997 and 2002.[90] The medications that she took for pain caused nausea that prevented her from being able to read.[91] The Oxycontin that she was prescribed also caused increased sleepiness.[92]

---

[90]    Rec. Doc. 11-1 at 95.

[91]    Rec. Doc. 11-1 at 95, 97.

[92]    Rec. Doc. 11-1 at 98.

The claimant stated that, following the accident, she was in pain from her waist down to her toes on the right side.[93]  She described the pain as severe[94] and testified that increased activity would intensify the pain.[95]  She got some relief using a heating pad and trigger point gel.[96]  She testified that she also had trouble going to sleep.[97]  She claimed that she was unable to cook clean, shop, or do any household chores, all of which were taken over by her husband.[98]  She testified that, between 1997 and 2002, she could not walk very far and could sit for only about half an hour before having to get up and move around.[99]  She testified that a doctor told her not to lift more than ten pounds.[100]

She stated that she treated with Dr. Staires at LGMC's pain clinic following the accident.[101]  However, she denied that the pain management treatment received

---

[93]     Rec. Doc. 11-1 at 89.

[94]     Rec. Doc. 11-1 at 94.

[95]     Rec. Doc. 11-1 at 98.

[96]     Rec. Doc. 11-1 at 94.

[97]     Rec. Doc. 11-1 at 94.

[98]     Rec. Doc. 11-1 at 92-93.

[99]     Rec. Doc. 11-1 at 96.

[100]     Rec. Doc. 11-1 at 96-97.

[101]     Rec. Doc. 11-1 at 99-100.  The record, however, does not contain any records from Dr. Staires or the LGMC pain clinic in that time period.

prior to surgery relieved her pain.[102]  Dr. Muldowny performed surgery on the claimant's back in December 2002.[103]  The claimant testified that, after the back surgery, her right leg symptoms worsened, causing her to fall.[104]  In her opinion, her condition was worse than it was in 2002.[105]

The claimant stated that she treated with Dr. James Blackburn for depression from January 1997 until the time of the hearing.[106]  She described her depression as debilitating.[107]  She stated that her depression stemmed from her back injury resulting in her not being able to be as active as she was before the accident.[108]  She testified that the medication and counseling from Dr. Blackburn had helped her symptoms in that she no longer cried every day.[109]

The claimant now seeks to have the Commissioner's denial of her application for Social Security disability benefits reversed.

---

[102]     Rec. Doc. 11-1 at 90.

[103]     Rec. Doc. 11-1 at 86, 89.

[104]     Rec. Doc. 11-1 at 90, 97.

[105]     Rec. Doc. 11-1 at 97.

[106]     Rec. Doc. 11-1 at 90.

[107]     Rec. Doc. 11-1 at 92.

[108]     Rec. Doc. 11-1 at 91.

[109]     Rec. Doc. 11-1 at 92.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[110]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[111] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[112]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[113]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[114]  Conflicts in

---

[110]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[111]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[112]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[113]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[114]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

the evidence[115] and credibility assessments[116] are for the Commissioner to resolve, not the courts. Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[117]

## B.   Entitlement to Benefits

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[118] The Supplemental Security Income ("SSI") program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled.[119]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

---

[115]   *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[116]   *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[117]   *Wren v. Sullivan*, 925 F.2d at 126.

[118]   See 42 U.S.C. § 423(a).

[119]   42 U.S.C. § 1382(a)(1) & (2).

last for a continuous period of not less than twelve months."[120]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[121]

Ms. McCauley applied for both DIB and SSI in 2014.  Her SSI application was granted, and she is receiving SSI benefits.  Her application for DIB was denied.  Because Ms. McCauley was insured for DIB purposes only through June 30, 2002, the critical issue that must be resolved is whether she was disabled on or before that date.  If not, she is not eligible for DIB benefits.

## C.    Evaluation Process and Burden of Proof

A sequential five-step inquiry is used to determine whether a claimant is disabled.  This process requires the Commissioner to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1;

---

[120]      42 U.S.C. § 1382c(a)(3)(A).

[121]      42 U.S.C. § 1382c(a)(3)(B).

(4) is able to do the kind of work he did in the past; and (5) can perform any other work.[122]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[123] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[124] The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[125]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[126] This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[127] If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[122]     20 C.F.R. § 404.1520.

[123]     20 C.F.R. § 404.1520(a)(4).

[124]     20 C.F.R. § 404.1545(a)(1).

[125]     20 C.F.R. § 404.1520(e).

[126]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[127]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[128]  If the Commissioner determines that the claimant is disabled

or not disabled at any step, the analysis ends.[129]

**D.**     **The ALJ's Findings and Conclusions**

It is undisputed that the claimant last met the insured status requirements of

the Social Security Act on June 30, 2002.  The ALJ determined, at step one, that the

claimant did not engage in substantial gainful activity between January 17, 1997 (the

alleged disability onset date) and June 30, 2002 (the date she was last insured for

Social Security disability benefits).[130]  This finding is supported by substantial

evidence in the record.

At step two, the ALJ found that the claimant has the following severe

impairments:  lumbar degenerative disc disease and obesity.[131]  This finding is

supported by substantial evidence in the record.  However, the claimant argued that

her depression should also have been found to be severe.

---

[128]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[129]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[130]     Rec. Doc. 11-1 at 64.

[131]     Rec. Doc. 11-1 at 64.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[132] The claimant did not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform sedentary work except the she can sit continuously for only one hour and then needs to stand and stretch at her work station for a few minutes before resuming sitting.[133] The claimant challenged this finding.

At step four, the ALJ found that the claimant is capable of performing her past relevant work as a data entry clerk.[134] The claimant challenged this finding.

At step five, the ALJ found that the claimant was not disabled from January 1, 1997 (the alleged disability onset date) through June 30, 2002 (the date she was last insured) because there are jobs in the national economy that she can perform.[135] The claimant challenged this finding.

## E.    <u>The Allegations of Error</u>

The claimant contends that the ALJ erred (1) in finding that her depression is not severe; (2) in failing to properly evaluate the medical opinions of the claimant's

---

[132]    Rec. Doc. 11-1 at 67.

[133]    Rec. Doc. 11-1 at 68.

[134]    Rec. Doc. 11-1 at 75.

[135]    Rec. Doc. 11-1 at 76.

treating psychiatrist, Dr. Blackburn; and (3) in failing to properly consider the side effects of the claimant's medications in evaluating her residual functional capacity.

**F.    The Severity of the Claimant's Depression**

The claimant argued that the ALJ erred in failing to find that her depression was a severe impairment.  In support of that argument, she stated that her depression caused or contributed to her nearly daily crying spells and spending more than half of nearly every day in bed."[136]  Additionally, she pointed to her use of psychoactive medications as evidence of the severity of her depression.[137]

To evaluate whether a claimant's medical condition qualifies as a "severe impairment" at step two of the sequential analysis, the Commissioner issued regulations that define a "severe impairment" as one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."[138]  The Fifth Circuit held, however, that a literal application of that definition is inconsistent with the statutory language and legislative history of the Social Security Act.[139]  Therefore, the Fifth Circuit established the following standard for determining

---

[136]    Rec. Doc. 14 at 7.

[137]    Rec. Doc. 14 at 7.

[138]    20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521 ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

[139]    *Stone v. Heckler*, 752 F.2d 1099, 1104–05 (5th Cir. 1985).

whether a claimant's impairment is severe: an impairment is not severe only when it is a "slight abnormality" having "such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education[,] or work experience."[140]

Here, the ALJ expressly acknowledged the claimant's symptoms associated with depression: crying often, having sleep difficulties, and difficulties getting along with others. The ALJ also expressly acknowledged that the claimant took medications for her depression. But the ALJ concluded that the claimant's depression "did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore non-severe."[141] Following a careful reading of the ALJ's decision, this Court finds that the ALJ applied the proper standard in reaching this conclusion and further finds that the conclusion is supported by substantial evidence in the record.

The record indicates that the claimant treated with psychiatrist Dr. Blackburn from 1999 to 2002 and from 2012 to 2014. Dr. Blackburn stated several times that the claimant was depressed, and he described the claimant's depression as "severe" on more than one occasion. However, Dr. Blackburn's records contain no clinical findings supporting his diagnosis of a severe depression and his records do not

---

[140]    *Stone v. Heckler*, 752 F.2d at 1101.

[141]    Rec. Doc. 11-1 at 65.

explain how the claimant's depression affected her functionality. In fact, most of the information in Dr. Blackburn's records is related to the claimant's pain complaints rather than to her alleged depression. Dr. Blackburn's treatment notes also contain indications that the medications prescribed to treat Ms. McCauley's depression helped to improve her mood and stabilize her emotions.[142]

Further, the ALJ took the claimant's depression into account when she evaluated the claimant's residual functional capacity. In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[143] The ALJ must consider all of the claimant's symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.[144] In this case, the ALJ did just that, taking into account the claimant's depression as well as her other impairments. Therefore, the claimant was not prejudiced by the ALJ's finding that her depression was not severe and any potential error in that regard was harmless.

---

[142]    Rec. Doc. 17-3 at 147-149, 176-177, 84-85, 248.

[143]    *Martinez v. Chater*, 64 F.3d at 176.

[144]    *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

For these reasons, this Court finds that the ALJ did not err in determining that the claimant's depression was not severe.

## G.  The ALJ's Evaluation of Dr. Blackburn's Opinions

The claimant argued that the ALJ erred by improperly discounting the opinions of her treating psychiatrist, Dr. Blackburn.  The ALJ has sole responsibility for determining the claimant's disability status.[145]  Although a treating physician's opinions are not determinative, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight by the ALJ in determining disability.[146]  In fact, when a treating physician's opinion regarding the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give that opinion controlling weight.[147]  If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so.[148]  Good cause may be shown if the treating

---

[145]     *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

[146]     *Pineda v. Astrue*, 289 Fed. App'x 710, 712-713 (5th Cir. 2008), citing *Newton v. Apfel*, 209 F.3d at 455.

[147]     20 C.F.R. § 404.1527(c)(2).  See, also, *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

[148]     *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-44 (5th Cir. 2009).

physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[149]

In this case, the claimant did not identify any particular opinion of Dr. Blackburn that she believes the ALJ improperly discounted. She did, however, reference the numerous reports authored by Dr. Blackburn that are contained in the record. On April 26, 2001, for example, Dr. Blackburn issued a "psychiatric report" to the claimant's workers' compensation case manager. In that report, Dr. Blackburn opined that the claimant's pain aggravated her emotional distress and further opined that she is "too depressed, distressed[,] and experiencing too much turmoil to function in any gainful employment situation."[150] But most of the report is devoted to Dr. Blackburn's opinions regarding the claimant's physical complaints. Neither that report nor any other report in the record from Dr. Blackburn contains objective clinical findings or assessments regarding the claimant's depression or any other mental impairment that she might have. There is no evidence that Dr. Blackburn ever administered any psychological or psychiatric testing to Ms. McCauley. There is no evidence that Dr. Blackburn ever made a formal diagnosis of Ms. McCauley's mental condition based on criteria set forth in any psychiatric or psychological manual or that he ever assigned a Global Assessment of Functioning ("GAF")

---

[149]    *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-444.

[150]    Rec. Doc. 11-2 at 156.

score.[151]  There is no evidence that he ever used any type of scale to determine the level of her depression or the effect of her depression on her functionality.  In his treatment notes, Dr. Blackburn did not expressly evaluate Ms. McCauley's affect, mood, memory, concentration, thought processes, thought content, insight, or judgment.  Instead, he relied solely upon her subjective reporting of symptoms and described how she presented herself to him:  i.e., discouraged, frustrated, angered, tearful, crying, distressed, distraught, emotionally upset.  She reported having panic attacks on a few occasions, and she once reported suicidal thoughts.  But neither panic attacks nor suicidal ideation were mentioned in the "psychiatric report" or cited as a basis for the claimant being unable to work.  In the "psychiatric report," Dr. Blackburn discussed the claimant's pain complaints, opined that her hypertension was a result of a decrease in pain medication, denied that medications he was prescribing were addictive while admitting that Ms. McCauley had a psychological dependency on them, opined that her pain aggravates her emotional distress, and opined that she would not be fit for employment unless her physical complaints were resolved.  No mental status examinations in the relevant time period were conducted by Dr. Blackburn, and his opinions appear to be based on the

---

[151]     The GAF scale is used to rate an individual's "overall psychological functioning." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994).  The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status.

claimant's subjective allegations rather than on clinical findings. Thus, his opinion regarding her functionality was conclusory and not supported by clinical findings.

When the claimant was evaluated by a psychologist, Dr. Friedberg, he tested her intelligence and her memory. He used the MMPI to assess her personality traits and psychopathology. He tested her concentration and attention to visual material. He also used the Beck Depression Inventory to evaluate her depression. That test revealed that the claimant had minimal depressive symptomatology. The MMPI showed that she was preoccupied with physical difficulties but did not reveal excessive anxiety or depression. Thus, as opposed to Dr. Blackburn's reliance on the claimant's subjective allegations, Dr. Friedberg used objective testing to compare the claimant's reported symptoms against scientifically-derived data, making his evaluation of the claimant's functionality more reliable. In his opinion, she was capable of returning to work so long as her vocational pursuits did not compromise her medical situation or exacerbate her pain. The ALJ gave Dr. Friedberg's opinions some weight.

The claimant argued that Dr. Blackburn's opinions were supported by Dr. Gammel's clinical findings, opinions, and assessments. But Dr. Gammel opined in February 2002 that the claimant was capable of performing light to sedentary work. Therefore, his opinions did not align with those of Dr. Blackburn with regard to the claimant's functional abilities.

Particularly after comparing the approach employed by Dr. Blackburn with that employed by Dr. Friedberg, this Court finds that the ALJ properly gave Dr. Blackburn's opinions little weight since there is substantial evidence in the record that Dr. Blackburn's opinions were conclusory and not objectively corroborated.

## H.     The Impact of the Side Effects of the Claimant's Medications on her Residual Functional Capacity

The claimant argued that the ALJ erred in failing to consider the side effects of her prescribed medications, including Oxycontin and Valium, when evaluating her residual functional capacity. Ms. McCauley testified that her medications made her sleepy, caused nausea, and interfered with her ability to read. Thus, she argued that these side effects impaired her functionality.

The flaw in this argument is that Ms. McCauley was not taking these medications at all relevant times. In fact, more than one physician opined that she was taking too much analgesic medication, and she was required to get off of the narcotic medications in order to be treated by Dr. Reavill. Therefore, at some times during the relevant time period between 1997 and 2002, the claimant was not taking these medications and consequently was not subject to any side effects that they might have caused. At other times, the side effects may have been attributable to the high doses of analgesic medication that the claimant was taking, which treating orthopedist Dr. Mayeux found to be out of proportion with objective findings.

Finally, the ALJ did consider the side effects of the claimant's medications but found the claimant's allegations concerning side effects "not generally consistent with her actions and admissions."[152]  This Court interprets this to mean that the claimant continued to take large doses of medications despite the side effects and despite more than one physician's conclusion that she was either magnifying her symptoms or did not require the amount of pain medication that she was taking.

This Court therefore finds that the ALJ did not err in evaluating the effect of the side effect of the claimant's medications on her functionality.

## Conclusion and Recommendation

For the foregoing reasons, the decision of the Commissioner is AFFIRMED and this matter is DISMISSED WITH PREJUDICE.

Signed at Lafayette, Louisiana, this 4th day of June 2019.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[152]    Rec. Doc. 11-1 at 71.